IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff, <br><br> v. <br><br> **JASON WILLIAM SIESSER**, <br><br> Defendant. | No. 18-04107-01-CR-C-RK |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through Teresa A. Moore, Acting United States Attorney for the Western District of Missouri, and undersigned counsel, respectfully submits this sentencing memorandum in the above captioned matter. For the reasons set forth below, the Government recommends that the Court sentence the defendant, Jason William Siesser, to a total sentence of 144 months' imprisonment, followed by five years' supervised release, and a mandatory special assessment of $200.

## I.   BACKGROUND

Between June 14, 2018, and August 23, 2018, said dates being approximate, within Boone County, in the Western District of Missouri, and elsewhere, the defendant, knowingly attempted to acquire, receive, retain, and possess a chemical weapon via the internet on two occasions. The defendant paid for the chemical weapon with a digital "crypto" currency known as Bitcoin (BTC), existing entirely on the internet and not in any physical form. The defendant ordered a highly toxic chemical, in amounts capable of killing many people, to be delivered to 1013 Southampton Dr., Columbia, Missouri, in the name of Juvenile #1. No one who resides at the residence was engaged in an occupation or purpose that is allowed under 18 U.S.C. § 229.

On July 4, 2018, the defendant sent BTC to the seller of the chemical weapon via the internet after having acknowledged to the seller that he understood that the acquisition of the chemical weapon posed a risk of death to anyone who came into direct or indirect contact with it. The defendant provided the shipping address in the name of Juvenile #1, referred to by his middle and last names, at 1013 Southampton Dr., Columbia, MO 65203. The defendant ordered two (2) ten (10) milliliter (ml) units of the chemical weapon. The seller did not ship the chemical weapon to the defendant at that time.

The defendant continued to contact the seller. On July 19, 2018, the defendant told the seller that, "I plan to use it soon after I receive it. I don't really have any concerns. If you have any tips or care to offer advice feel free."

On August 5, 2018, the defendant made a second attempt to purchase the chemical weapon from the seller. The defendant provided the shipping address in the name of Juvenile #1, referred to by his first initial and last name, at 1013 Southampton Dr., Columbia, MO 65203. The defendant ordered three (3) ten (10) millimeter (ml) units of the chemical weapon. The defendant paid for this order with BTC, paying the equivalent of $150 USD. This quantity of the chemical weapon has the capacity to kill approximately 300 persons.

On August 23, 2018, at approximately 13:11 hours, at 1013 Southampton Dr., Columbia, Missouri, the defendant signed for a package addressed to Juvenile #1, referred to by his first initial and last name, at 1013 Southampton Dr., Columbia, MO 65203. The defendant understood that the package contained the chemical weapon he had ordered from the seller. This package contained an inert substance, not the chemical weapon. After the defendant received the package containing what he believed to be the chemical weapon he ordered, surveillance officers observed the defendant open an exterior door of the residence to ventilate the interior.

On August 23, 2018, at approximately 13:43 hours, law enforcement executed a federal search warrant at 1013 Southampton Dr., Columbia, Missouri. The defendant was the only person present at the residence when the package was delivered and when the search warrant was executed.

As law enforcement executed the search warrant, the defendant came to the front door after officers knocked and announced their presence. The defendant was detained and asked if there was anything that would harm officers. The defendant stated that there was a quantity of acid and powder in the garage on the top shelf. When asked about the package that had just been delivered, the defendant said that he did not know what the agent meant. The defendant stated that he had just had a speaker delivered and that the speaker was on the shelf with the acid and powder.

Officers located the USPS shipping box delivered at 13:11 hours on top of a dog kennel near the rear door. The box was opened with contents removed. Inside a large round trashcan in the garage, officers found the discarded vessel in which the chemical weapon was contained, with the vials removed. On top of a shelf affixed to the west wall of the garage, officers located the inert substance the defendant believed to be a chemical weapon precisely where the defendant said it would be.

Next to the inert substance the defendant believed to be a chemical weapon, officers located two separate and seemingly unopened shipping boxes that were found to contain approximately 10 grams of cadmium arsenide, a toxic compound, which can be deadly if ingested or inhaled; approximately 100 grams of cadmium metal and approximately 500 ml of hydrochloric acid. An invoice for these products showed that they had been ordered together on March 30, 2018, and delivered to an address in Higbee, Missouri. If mixed together, cadmium and hydrochloric acid can create an expanding, pressure creating gas that could escape a containment device.

Writings located within the home articulated heartache, anger, and resentment over a breakup and a desire for the unidentified cause of the heartache to die. In part, one of these writings stated:

> I wish I'd never met you but now it's not too late. The things you've taught me showed me a new kind of love. Our early ending was all wrong. You discarded me like trash but look how I got strong.
>
> Now that I see you just for what you are I know better. I still have the scar Some day I'll find you and make your day. The darkness that consumes me will overflow one day.
>
> You were there to teach me something I already knew Now it's my turn to teach you a lesson filled with pain Your life is forfeit, flushed down the drain.

Another writing stated:

> They say I should let it go But my hatred's just too strong Letting go of anger is the right thing But it makes me feel so strong I dream about your ending You burn up in flames You suffocate on your own blood Your soul completely drained Right now your happy But that won't last My anger is coming And you won't die fast!

No equipment used to conduct chemistry or genetic experiments was located inside the residence.

Juvenile #1 was interviewed. Juvenile #1 had been placed in the defendant's custody on June 13, 2018, by the State of Missouri. Juvenile #1 never used the Southampton Dr. address to receive a package. Juvenile #1 stated that if his/her name was the addressee on a package someone other than him/her ordered the package. On two or three occasions, the defendant explained to Juvenile #1 and Juvenile #2 (another person in the defendant's custody) that there were dangerous chemicals in the residence. The defendant told Juvenile #1 and Juvenile #2 that they were to never handle the chemicals. Juvenile #1 had never actually seen any chemicals in the residence. Juvenile #1 and Juvenile #2 were allowed in all areas of the residence. Juvenile #1 never witnessed any

chemistry equipment laying around the house. Juvenile #1 never saw the defendant conducting any chemistry type experiments. The defendant told Juvenile #1 that he wanted to kill those that have wronged him in the past. The defendant stated that he wanted to kill his "Ex" from the Netherlands, as well as, others. Juvenile #1 wasn't sure if the defendant was serious.

The defendant was interviewed after waiving his Miranda rights. The defendant admitted he purchased three vials of the chemical weapon from a website for $52 worth of BTC per vial. The defendant admitted that he used the name of Juvenile #1, who he cared for at 1013 Southampton Dr., because he did not want to get in trouble if the purchase was traced to him. The defendant knew a permit was required to purchase the chemical weapon because it was so toxic that only a drop or two could kill someone after months of suffering. The defendant had read an article about a scientist who died after being exposed to the chemical weapon. The defendant had previously attempted to purchase the chemical weapon from a legitimate internet chemical supplier, but the sale was refused because the defendant did not have the required permit. The defendant told this supplier the chemical weapon was for a gifted chemistry student. The defendant claimed he purchased the chemical weapon for scientific experiments related to biohacking, a form of gene editing through protein manipulation. The defendant had no education or training in chemistry or genetics, no equipment to complete the experiments, and had not yet decided what experiments he intended to conduct. The only other step the defendant took to set up his home laboratory was to purchase hydrochloric acid, cadmium, and cadmium arsenide. The defendant was unable to recall how these compounds were used in biohacking. The defendant claimed the chemical weapon he purchased was used to denature proteins in bio-hacking experiments. The defendant had no response when advised by an FBI Special Agent that the chemical weapon he purchased was not used in gene editing, and its ability to denature proteins is what made it toxic.

5

The defendant had two relationships with women that left him brokenhearted. The defendant was married to S.S. and lived with her in the Netherlands until approximately 2012. After years of separation, the defendant and S.S. divorced in 2017 when he met A.W. in Columbia, Missouri. Although they had only three dates, the defendant felt a strong connection with A.W. The defendant was depressed for six months and sought counselling after A.W. unexpectedly broke it off with him. The defendant wrote fictional stories about men exacting vengeance on ex-girlfriends. In one story, a man used a fertilizer spreader to lace a woman's yard with asbestos, which ultimately killed her decades later. In another story, a man locked a woman in scuba gear in a submerged box so she would die when her oxygen tank was depleted.

On August 4, 2020, pursuant to a written plea agreement, Siesser pled guilty to Counts 1 and 4 of the Indictment that charged him with attempt to acquire a chemical weapon (Count 1) and aggravated identity theft (Count 4). The Government agreed to dismiss Counts 2 and 3 at sentencing. Finally, the parties jointly recommend that the Court impose a sentence of imprisonment of eighty-four (84) months on Count 1 and a consecutive sentence of imprisonment of sixty (60) months on Count 4 for a total sentence of imprisonment of one-hundred-forty-four (144) months of imprisonment.

The United States Probation Office calculated the Sentencing Guidelines as follows:

**Count 1:**
**Base Offense Level: § 2M6.1(a)(2)**      **28**
**Specific Offense Characteristics:**
    § 2M6.1(b)(1) (threat to use)      +2
**Adjustment for Abuse of a Position of Trust § 3B1.3**      **+2**
**Acceptance of Responsibility § 3E1.1(a)**      **-2**
**Acceptance of Responsibility § 3E1.1(b)**      **-1**
**Total Offense Level**      **29**

**Count 4**
**Base Offense Level: § 2B1.6**      consecutive sentence of 60 months

With a Criminal History Category of I (zero (0) criminal history points), this calculation results in an applicable Guidelines range of 87 to 108 months' imprisonment for Count 1, and a consecutive sentence of 60 months for Count 2. These Guidelines ranges provided for a combined total sentencing range of 147 to 168 months.

There are no objections to these calculations. The parties jointly recommend that the Court impose a sentence of imprisonment of eighty-four (84) months on Count 1 and a consecutive sentence of imprisonment of sixty (60) months on Count 4 for a total sentence of imprisonment of one-hundred-forty-four (144) months of imprisonment.

## II. DISCUSSION

Even after *United States v. Booker*, 543 U.S. 220 (2005), sentencing begins with a properly calculated advisory Sentencing Guidelines range, including any applicable departures. *See* United States Sentencing Commission, Guidelines Manual, § 1B1.1(a) and (b). The Court then must consider that range, along with all the factors listed in 18 U.S.C. § 3553(a), in arriving at the final sentence. USSG § 1.1B1(c).

Prior to imposing sentence, the Court is required to consider Siesser's history and characteristics, 18 U.S.C. § 3553(a)(1), whether a particular sentence is necessary to protect the public from his further crimes, 18 U.S.C. § 3553(a)(1)(C), the nature and circumstances of Siesser's offenses of conviction, 18 U.S.C. § 3553(a)(1), the type of sentences called for by statute and the advisory Guidelines, 18 U.S.C. §§ 3553(a)(3) and (a)(4), the need for the sentences to reflect the seriousness of the offenses, promote respect for the law, and provide just punishment for the offenses, 18 U.S.C. § 3553(a)(2)(A), and the type of sentences needed to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B).

The Supreme Court has observed that "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives'." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)). The parties submit that a total sentence of 144-months is sufficient, but not greater than necessary, to meet the goals outlined in 18 U.S.C. § 3553(a) for the reasons set forth below.

Given Siesser's offense conduct, the potentially devastating impact of that conduct, the absence of criminal history, the need to protect the public from his crimes, the need to specifically deter him from future criminal conduct and the need to promote respect for the law, a total sentence of 144-months followed by five years' supervised release is reasonable and justified under § 3553(a).

### *Recommended Sentence for Monetary Penalties*

While Siesser has financial resources, the Government is not advocating that a fine be imposed. However, the $200 Special Assessment is mandatory and, as a result, must be paid in full by Siesser no later than the day of sentencing.

### III. CONCLUSION

The Government respectfully suggests that a sentence of imprisonment of eighty-four (84) months on Count 1 and a consecutive sentence of imprisonment of sixty (60) months on Count 4 for a total sentence of imprisonment of one-hundred-forty-four (144) months of imprisonment followed by five years' supervised release constitutes a sentence sufficient, but not greater than necessary, to achieve justice.

Respectfully submitted,

**Teresa A. Moore**
Acting United States Attorney

By  /S/

**Michael S. Oliver**
Assistant United States Attorney
Missouri Bar No. 41832

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on April 1, 2021, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

/S/
**Michael S. Oliver**
Assistant United States Attorney

10